# UNITED STATES *v.* WATSON

No. 74–538.   Argued October 8, 1975—Decided January 26, 1976

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 425. STEWART, J., filed an opinion concurring in the result, *post,* p. 433. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 433. STEVENS, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Acting Assistant Attorney General Keeney,* and *Peter M. Shannon, Jr.*

*Michael D. Nasatir,* by appointment of the Court, 421 U. S. 997, argued the cause for respondent. With him on the brief was *Donald M. Re.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case presents questions under the Fourth Amendment as to the legality of a warrantless arrest and of an ensuing search of the arrestee's automobile carried out with his purported consent.

I

The relevant events began on August 17, 1972, when an informant, one Khoury, telephoned a postal inspector informing him that respondent Watson was in possession of a stolen credit card and had asked Khoury to cooperate in using the card to their mutual advantage. On five to 10 previous occasions Khoury had provided the inspector with reliable information on postal inspection matters, some involving Watson. Later that day

Khoury delivered the card to the inspector. On learning that Watson had agreed to furnish additional cards, the inspector asked Khoury to arrange to meet with Watson. Khoury did so, a meeting being scheduled for August 22.[1] Watson canceled that engagement, but at noon on August 23, Khoury met with Watson at a restaurant designated by the latter. Khoury had been instructed that if Watson had additional stolen credit cards, Khoury was to give a designated signal. The signal was given, the officers closed in, and Watson was forthwith arrested. He was removed from the restaurant to the street where he was given the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966). A search having revealed that Watson had no credit cards on his person, the inspector asked if he could look inside Watson's car, which was standing within view. Watson said, "Go ahead," and repeated these words when the inspector cautioned that "[i]f I find anything, it is going to go against you." Using keys furnished by Watson, the inspector entered the car and found under the floor mat an envelope containing two credit cards in the names of other persons. These cards were the basis for two counts of a four-count indictment charging Watson with possessing stolen mail in violation of 18 U. S. C. § 1708.[2]

Prior to trial, Watson moved to suppress the cards, claiming that his arrest was illegal for want of probable cause and an arrest warrant and that his consent to search the car was involuntary and ineffective because he had not been told that he could withhold consent.

---

[1] In the meantime the inspector had verified that the card was stolen.

[2] Title 18 U. S. C. § 1708 punishes the theft of mail as well as the possession of stolen mail. The punishment is a fine of not more than $2,000 or imprisonment for not more than five years, or both.

The motion was denied, and Watson was convicted of illegally possessing the two cards seized from his car.[3]

A divided panel of the Court of Appeals for the Ninth Circuit reversed, 504 F. 2d 849 (1974), ruling that the admission in evidence of the two credit cards found in the car was prohibited by the Fourth Amendment. In reaching this judgment, the court decided two issues in Watson's favor. First, notwithstanding its agreement with the District Court that Khoury was reliable and that there was probable cause for arresting Watson, the court held the arrest unconstitutional because the postal inspector had failed to secure an arrest warrant although he concededly had time to do so. Second, based on the totality of the circumstances, one of which was the illegality of the arrest, the court held Watson's consent to search had been coerced and hence was not a valid ground for the warrantless search of the automobile. We granted certiorari. 420 U. S. 924 (1975).

## II

A major part of the Court of Appeals' opinion was its holding that Watson's warrantless arrest violated the Fourth Amendment. Although it did not expressly do so, it may have intended to overturn the conviction on the independent ground that the two credit cards were the inadmissible fruits of an unconstitutional arrest. Cf. *Brown* v. *Illinois,* 422 U. S. 590 (1975). However that may be, the Court of Appeals treated the illegality of Watson's arrest as an important factor in determining the voluntariness of his consent to search his car. We therefore deal first with the arrest issue.

Contrary to the Court of Appeals' view, Watson's arrest was not invalid because executed without a warrant.

---

[3] Watson was acquitted on the second count. The fourth was dismissed prior to trial.

Title 18 U. S. C. § 3061 (a)(3) expressly empowers the Board of Governors of the Postal Service to authorize Postal Service officers and employees "performing duties related to the inspection of postal matters" to

> "make arrests without warrant for felonies cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony."

By regulation, 39 CFR § 232.5 (a)(3) (1975), and in identical language, the Board of Governors has exercised that power and authorized warrantless arrests. Because there was probable cause in this case to believe that Watson had violated § 1708, the inspector and his subordinates, in arresting Watson, were acting strictly in accordance with the governing statute and regulations. The effect of the judgment of the Court of Appeals was to invalidate the statute as applied in this case and as applied to all the situations where a court fails to find exigent circumstances justifying a warrantless arrest. We reverse that judgment.

Under the Fourth Amendment, the people are to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause . . . ." Section 3061 represents a judgment by Congress that it is not unreasonable under the Fourth Amendment for postal inspectors to arrest without a warrant provided they have probable cause to do so.[4] This was not an

---

[4] At least since approval of the Act of June 10, 1955, c. 137, § 203, 69 Stat. 106, 39 U. S. C. § 3523 (a)(2)(K) (1964 ed.), postal inspectors' duties have been thought to permit arrest without a warrant upon probable cause. Compare *United States* v. *Helbock*, 76 F. Supp. 985 (Ore. 1948), with *United States* v. *Alexander*, 415 F. 2d 1352 (CA7 1969), cert. denied, 397 U. S. 1014 (1970); *Kelley* v. *Dunne*, 344 F. 2d 129 (CA1 1965); and *United*

isolated or quixotic judgment of the legislative branch. Other federal law enforcement officers have been expressly authorized by statute for many years to make felony arrests on probable cause but without a warrant. This is true of United States marshals, 18 U. S. C. § 3053, and of agents of the Federal Bureau of Investigation, 18 U. S. C. § 3052; the Drug Enforcement Administration, 84 Stat. 1273, 21 U. S. C. § 878; the Secret Service, 18 U. S. C. § 3056 (a); and the Customs Service, 26 U. S. C. § 7607.[5]

Because there is a "strong presumption of constitutionality due to an Act of Congress, especially when it turns on what is 'reasonable,'" "[o]bviously the Court should be reluctant to decide that a search thus authorized by Congress was unreasonable and that the Act was therefore unconstitutional." *United States* v. *Di Re,* 332 U. S. 581, 585 (1948). Moreover, there is nothing in the Court's prior cases indicating that under the

*States* v. *Bell,* 294 F. Supp. 1314 (ND Ill. 1968). The Court of Appeals for the Ninth Circuit held, however, that § 3523 (a) (2) (K) did not give the necessary express power to arrest, but that a warrantless arrest by a postal inspector could be upheld by resort to a citizen's power to arrest. *United States* v. *DeCatur,* 430 F. 2d 365 (1970); *Neggo* v. *United States,* 390 F. 2d 609 (1968); *Ward* v. *United States,* 316 F. 2d 113, cert. denied, 375 U. S. 862 (1963).

In 1968 in the face of confusion generated by these decisions and two others striking down warrantless arrests by postal inspectors as not authorized by federal statute or by state law, *Alexander* v. *United States,* 390 F. 2d 101 (CA5 1968); *United States* v. *Moderacki,* 280 F. Supp. 633 (Del. 1968), the Congress enacted 18 U. S. C. § 3061 to make clear that postal inspectors are empowered to arrest without warrant upon probable cause. Pub. L. 90–560, § 5 (a), 82 Stat. 998; H. R. Conf. Rep. No. 1918, 90th Cong., 2d Sess., 6 (1968); H. R. Rep. No. 1725, 90th Cong., 2d Sess. (1968); 114 Cong. Rec. 20914–20915, 26928, 28864–28865 (1968).

[5] There are other federal officers subject to a more restrictive statutory standard. See, *e. g.,* 18 U. S. C. § 3050, with respect to employees of the Bureau of Prisons.

Fourth Amendment a warrant is required to make a valid arrest for a felony. Indeed, the relevant prior decisions are uniformly to the contrary.

"The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . ." *Carroll* v. *United States,* 267 U. S. 132, 156 (1925). In *Henry* v. *United States,* 361 U. S. 98 (1959), the Court dealt with an FBI agent's warrantless arrest under 18 U. S. C. § 3052, which authorizes a warrantless arrest where there are reasonable grounds to believe that the person to be arrested has committed a felony. The Court declared that "[t]he statute states the constitutional standard . . . ." 361 U. S., at 100. The necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest. In *Abel* v. *United States,* 362 U. S. 217, 232 (1960), the Court sustained an administrative arrest made without "a judicial warrant within the scope of the Fourth Amendment." The crucial question in *Draper* v. *United States,* 358 U. S. 307 (1959), was whether there was probable cause for the warrantless arrest. If there was, the Court said, "the arrest, though without a warrant, was lawful . . . ." *Id.,* at 310. *Ker* v. *California,* 374 U. S. 23, 34–35 (1963) (opinion of Clark, J.), reiterated the rule that "[t]he lawfulness of the arrest without warrant, in turn, must be based upon probable cause . . ." and went on to sustain the warrantless arrest over other claims going to the mode of entry. Just last Term, while recognizing that maximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, we stated that "such a requirement would constitute an intolerable handicap for legitimate law enforcement" and noted that the Court "has never invalidated an arrest supported by probable cause solely

because the officers failed to secure a warrant." *Gerstein* v. *Pugh,* 420 U. S. 103, 113 (1975).[6]

The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest. 10 Halsbury's Laws of England 344–345 (3d ed. 1955); 4 W. Blackstone, Commentaries *292; 1 J. Stephen, A History of the Criminal Law of England 193 (1883); 2 M. Hale, Pleas of the Crown *72–74; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 547–550, 686–688 (1924);

---

[6] In the case before us the Court of Appeals relied heavily, but mistakenly, on *Coolidge* v. *New Hampshire,* 403 U. S. 443, 480–481 (1971), for as we noted in *Gerstein* v. *Pugh,* 420 U. S., at 113 n. 13, the still unsettled question posed in that part of the *Coolidge* opinion was "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." Watson's midday public arrest does not present that question.

In its proposed Model Code of Pre-arraignment Procedure, the American Law Institute has addressed the question and recommends that an officer who is empowered to make an arrest and has probable cause to believe the person to be arrested is on private premises be authorized to demand entry to such premises and thereupon to enter to make an arrest. ALI, Model Code of Pre-arraignment Procedure § 120.6 (1) (1975). In certain cases of necessity, however, notification and demand are not required. § 120.6 (2). Authority to make nighttime arrests on private premises is restricted to arrests with warrants authorizing nighttime execution and to certain cases of necessity. § 120.6 (3). The commentary states that 24 States (and the District of Columbia) authorize forcible entry whenever there is authority to arrest, six whenever the arrest is under a warrant or for a felony, six whenever the arrest is under a warrant, and two whenever the arrest is for a felony. *Id.,* at 310, 696–697. Of these jurisdictions all but three have prior-notice requirements for entries to make an arrest similar to those 18 U. S. C. § 3109 imposes on entries to execute a search warrant. ALI Model Code, *supra,* at 310–313.

*Samuel* v. *Payne,* 1 Doug. 359, 99 Eng. Rep. 230 (K. B. 1780); *Beckwith* v. *Philby,* 6 Barn. & Cress. 635, 108 Eng. Rep. 585 (K. B. 1827). This has also been the prevailing rule under state constitutions and statutes. "The rule of the common law, that a peace officer or a private citizen may arrest a felon without a warrant, has been generally held by the courts of the several States to be in force in cases of felony punishable by the civil tribunals." *Kurtz* v. *Moffitt,* 115 U. S. 487, 504 (1885).

In *Rohan* v. *Sawin,* 59 Mass. 281 (1850), a false-arrest case, the Supreme Judicial Court of Massachusetts held that the common-law rule obtained in that State. Given probable cause to arrest, "[t]he authority of a constable, to arrest without warrant, in cases of felony, is most fully established by the elementary books, and adjudicated cases." *Id.,* at 284. In reaching this judgment the court observed:

> "It has been sometimes contended, that an arrest of this character, without a warrant, was a violation of the great fundamental principles of our national and state constitutions, forbidding unreasonable searches and arrests, except by warrant founded upon a complaint made under oath. Those provisions doubtless had another and different purpose, being in restraint of general warrants to make searches, and requiring warrants to issue only upon a complaint made under oath. They do not conflict with the authority of constables or other peace-officers, or private persons under proper limitations, to arrest without warrant those who have committed felonies. The public safety, and the due apprehension of criminals, charged with heinous offences, imperiously require that such arrests should be made without warrant by officers of the law." *Id.,* at 284–285.

Also rejected, *id.*, at 285–286, was the trial court's view that to justify a warrantless arrest, the State must show "an immediate necessity therefor, arising from the danger, that the plaintiff would otherwise escape, or secrete the stolen property, before a warrant could be procured against him." The Supreme Judicial Court ruled that there was no "authority for thus restricting a constable in the exercise of his authority to arrest for a felony without a warrant." *Id.*, at 286. Other early cases to similar effect were *Wakely* v. *Hart*, 6 Binn. 316 (Pa. 1814); *Tolley* v. *Mix*, 3 Wend. 350 (N. Y. Sup. Ct. 1829); *State* v. *Brown*, 5 Del. 505 (Ct. Gen. Sess. 1853); *Johnson* v. *State*, 30 Ga. 426 (1860); *Wade* v. *Chaffee*, 8 R. I. 224 (1865). See *Reuck* v. *McGregor*, 32 N. J. L. 70, 74 (Sup. Ct. 1866); *Baltimore & O. R. Co.* v. *Cain*, 81 Md. 87, 100, 102, 31 A. 801, 803, 804 (1895).[7]

Because the common-law rule authorizing arrests without a warrant generally prevailed in the States, it is important for present purposes to note that in 1792 Congress invested United States marshals and their deputies with "the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states have by law, in executing the laws of their respective states." Act of May 2, 1792, c. 28, § 9, 1 Stat. 265. The Second Congress thus saw no inconsistency between the Fourth Amendment and legislation giving United States marshals the same power as local peace officers to arrest for a felony without a warrant.[8] This provision equating the power of federal mar-

---

[7] As Professor Wilgus observed in his article Arrest Without A Warrant, 22 Mich. L. Rev. 541, 549–550 (1924) (footnote omitted), "[i]t was early argued that similar provisions [to the Fourth Amendment of the Constitution] in state constitutions forbade arrests without a warrant; it was ruled otherwise as to arrests by officers and private persons according to the common law."

[8] Of equal import is the rule recognized by this Court that even

shals with those of local sheriffs was several times re-enacted[9] and is today § 570 of Title 28 of the United States Code. That provision, however, was supplemented in 1935 by § 504a of the Judicial Code,[10] which in its essential elements is now 18 U. S. C. § 3053 and which expressly empowered marshals to make felony arrests without warrant and on probable cause. · It was enacted to furnish a federal standard independent of the vagaries of state laws, the Committee Report remarking that under existing law a "marshal or deputy marshal may make an arrest without a warrant within his district in all cases where the sheriff might do so under the State statutes." H. R. Rep. No. 283, 74th Cong., 1st Sess., 1 (1935). See *United States* v. *Riggs,* 474 F. 2d 699, 702–703, n. 2 (CA2), cert. denied, 414 U. S. 820 (1973).

The balance struck by the common law in generally authorizing felony arrests on probable cause, but without a warrant, has survived substantially intact. It ap-

---

in the absence of a federal statute granting or restricting the authority of federal law enforcement officers, "the law of the state where an arrest without warrant takes place determines its validity." *United States* v. *Di Re,* 332 U. S. 581, 589 (1948). Accord, *Miller* v. *United States,* 357 U. S. 301, 305 (1958); *Johnson* v. *United States,* 333 U. S. 10, 15 n. 5 (1948); *Bad Elk* v. *United States,* 177 U. S. 529, 535 (1900). This rule is consistent with the express statutory authority of United States marshals discussed in the text, as well as with the Act of Sept. 24, 1789, c. 20, § 33, 1 Stat. 91, providing that for any offense against the United States the offender may be arrested by any judge or justice of the United States "agreeably to the usual mode of process against offenders in such state" as he might be found. See *United States* v. *Di Re, supra,* at 589 n. 8.

 · [9] Act of Feb. 28, 1795, c. 36, § 9, 1 Stat. 425; Act of July 29, 1861, c. 25, § 7, 12 Stat. 282; Rev. Stat. § 788 (1874); Judicial Code of 1948, § 549, 62 Stat. 912.

[10] Act of June 15, 1935, c. 259, § 2, 49 Stat. 378.

pears in almost all of the States in the form of express statutory authorization. In 1963, the American Law Institute undertook the task of formulating a model statute governing police powers and practice in criminal law enforcement and related aspects of pretrial procedure. In 1975, after years of discussion, A Model Code of Pre-arraignment Procedure was proposed. Among its provisions was § 120.1 which authorizes an officer to take a person into custody if the officer has reasonable cause to believe that the person to be arrested has committed a felony, or has committed a misdemeanor or petty misdemeanor in his presence.[11] The commentary to this section said: "The Code thus adopts the traditional and almost universal standard for arrest without a warrant." [12]

---

[11] Section 120.1 of the Model Code provides, in pertinent part:

"(1) *Authority to Arrest Without a Warrant.* A law enforcement officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed

"(a) a felony;

"(b) a misdemeanor, and the officer has reasonable cause to believe that such person

"(i) will not be apprehended unless immediately arrested; or

"(ii) may cause injury to himself or others or damage to property unless immediately arrested; or

"(c) a misdemeanor or petty misdemeanor in the officer's presence."

[12] *Id.*, at 289 (footnote omitted). The commentary goes on to say with respect to § 120.1:

"This Section does not require an officer to arrest under a warrant even if a reasonable opportunity to obtain a warrant exists. As to arrests on the street such a requirement would be entirely novel. Moreover the need for it is not urgent, and the subsequent inquiry such a requirement would authorize would be indeterminate and difficult." *Id.*, at 303 (footnotes omitted).

As the commentary notes, *id.*, at 289 n. 1, a statute in the State of Georgia is more restrictive of the arrest power than the general

This is the rule Congress has long directed its principal law enforcement officers to follow. Congress has plainly decided against conditioning warrantless arrest power on proof of exigent circumstances.[13] Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. See *United States* v. *Ventresca,* 380 U. S. 102, 106 (1965); *Aguilar* v. *Texas,* 378 U. S. 108, 111 (1964); *Wong Sun* v. *United States,* 371 U. S. 471, 479–480 (1963). But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable

---

standard. Ga. Code Ann. § 27–207 (a) (Supp. 1975). See also Colo. Rev. Stat. Ann. § 16–3–102 (1973), which provides that an arrest warrant should be obtained "when practicable," and Mont. Rev. Codes Ann. § 95–608 (d) (1969) which authorizes a warrantless arrest if "existing circumstances require" it. A North Carolina statute, N. C. Gen. Stat. § 15–41 (1965), similar to the Georgia statute, was replaced in 1975 by a provision permitting warrantless felony arrests on probable cause. N. C. Gen. Stat. § 15A–401 (b) (2) (1975).

[13] Until 1951, 18 U. S. C. § 3052 conditioned the warrantless arrest powers of the agents of the Federal Bureau of Investigation on there being reasonable grounds to believe that the person would escape before a warrant could be obtained. The Act of Jan. 10, 1951, c. 1221, § 1, 64 Stat. 1239, eliminated this condition. The House Report explained the purpose of the amendment, H. R. Rep. No. 3228, 81st Cong., 2d Sess., 1–2 (1950), and the amendment was given effect by the courts in accordance with its terms. Compare *United States* v. *Coplon,* 185 F. 2d 629, 633–636 (CA2 1950), cert. denied, 342 U. S. 920 (1952), with *Coplon* v. *United States,* 89 U. S. App. D. C. 103, 108–109, 191 F. 2d 749, 753–754 (1951), cert. denied, 342 U. S. 926 (1952).

to get a warrant, whether the suspect was about to flee, and the like.

Watson's arrest did not violate the Fourth Amendment, and the Court of Appeals erred in holding to the contrary.

### III

Because our judgment is that Watson's arrest comported with the Fourth Amendment, Watson's consent to the search of his car was not the product of an illegal arrest. To the extent that the issue of the voluntariness of Watson's consent was resolved on the premise that his arrest was illegal, the Court of Appeals was also in error.

We are satisfied in addition that the remaining factors relied upon by the Court of Appeals to invalidate Watson's consent are inadequate to demonstrate that, in the totality of the circumstances, Watson's consent was not his own "essentially free and unconstrained choice" because his "will ha[d] been overborne and his capacity for self-determination critically impaired." *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 225 (1973). There was no overt act or threat of force against Watson proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station. Moreover, the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under *Schneckloth,* the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance. There is no indication in this record that Watson was a newcomer

to the law,[14] mentally deficient, or unable in the face of a custodial arrest to exercise a free choice. He was given *Miranda* warnings and was further cautioned that the results of the search of his car could be used against him. He persisted in his consent.

In these circumstances, to hold that illegal coercion is made out from the fact of arrest and the failure to inform the arrestee that he could withhold consent would not be consistent with *Schneckloth* and would distort the voluntariness standard that we reaffirmed in that case.

In consequence, we reverse the judgment of the Court of Appeals.

*So ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, concurring.

Although I concur in the opinion of the Court, I write to express additional views. I note at the outset that the case could be disposed of on the ground that respondent's consent to the search was plainly voluntary. *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973). Indeed, the evidence that his consent was the product of free will is so overwhelming that I would have held the consent voluntary even on the assumption that the preceding warrantless arrest was unconstitutional, and that the doctrine of *Wong Sun* v. *United States,* 371 U. S. 471 (1963), therefore was applicable. See *Brown* v. *Illinois,* 422 U. S. 590 (1975). The Court's different route to

---

[14] On the contrary, the inspector making the arrest in this case had arrested Watson in 1971 for mail theft. Those charges were dropped when Watson cooperated with the prosecution. During the ensuing two years he also furnished information to the authorities.

the same result requires, however, an inquiry into the validity of the arrest itself.

I

Respondent was arrested without a warrant in a public restaurant six days after postal inspectors learned from a reliable source that he possessed stolen credit cards in violation of 18 U. S. C. § 1708. The Government made no effort to show that circumstances precluded the obtaining of a warrant, relying instead for the validity of the arrest solely upon the showing of probable cause to believe that respondent had committed a felony. Respondent contends, and the Court of Appeals held, that the absence of any exigency justifying the failure to procure a warrant renders this arrest violative of the Fourth Amendment.

In reversing the Court of Appeals, the Court concludes that nothing in our previous cases involving warrantless arrests supports the position of respondent and the Court of Appeals. See, *e. g., Gerstein* v. *Pugh,* 420 U. S. 103, 113 (1975). But it is fair to say, I think, that the prior decisions of the Court have assumed the validity of such arrests without addressing in a reasoned way the analysis advanced by respondent.[1] Today's decision is

---

[1] None of the decisions cited by the Court today squarely faced the issue. In *Henry* v. *United States,* 361 U. S. 98 (1959), for example, the Court declared that 18 U. S. C. § 3052, which authorizes an FBI agent to make a warrantless arrest when he has reasonable grounds to believe that a person has committed a felony, "states the constitutional standard." 361 U. S., at 100. But that declaration was made without discussion, and the issue actually presented to and addressed by the Court was whether there was in fact probable cause for the arrest in that case. Similarly, *Draper* v. *United States,* 358 U. S. 307 (1959), stands only for the validity of a warrantless arrest made with probable cause to believe that the arrestee had committed an offense in the arresting officer's presence. See *id.,* at 313. As this Court had noted in an earlier case,

the first square holding that the Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though he had adequate opportunity to procure a warrant after developing probable cause for arrest.

On its face, our decision today creates a certain anomaly. There is no more basic constitutional rule in the Fourth Amendment area than that which makes a warrantless search unreasonable except in a few "jealously and carefully drawn" exceptional circumstances. *Jones* v. *United States,* 357 U. S. 493, 499 (1958); see *Almeida-Sanchez* v. *United States* 413 U. S. 266, 279–280 (1973) (POWELL, J., concurring); *United States* v. *United States District Court,* 407 U. S. 297, 314–321 (1972); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 454–455 (1971). On more than one occasion this Court has rejected an argument that a law enforcement officer's own probable cause to search a private place for contraband or evidence of crime should excuse his otherwise unexplained failure to procure a warrant beforehand. *Id.,* at 450; *Katz* v. *United States,* 389 U. S. 347, 356–358

---

such an arrest presents no danger that an innocent person might be ensnared, since the officer observes both the crime and the culprit with his own eyes; there thus would be no reason to require a warrant in that particular situation even if there might be in others. *Trupiano* v. *United States,* 334 U. S. 699, 705 (1948). Another case cited by the Court, *Carroll* v. *United States,* 267 U. S. 132 (1925), involved no challenge to an arrest. Nor did *Abel* v. *United States,* 362 U. S. 217 (1960), in which the Court refused to consider petitioner's challenge to his arrest under less than a judicial warrant because of his failure to raise the issue in the lower courts. See *id.,* at 230–232. Finally, in *Ker* v. *California,* 374 U. S. 23 (1963), the Court addressed only the questions of whether there was probable cause for arrest and whether the method of entry for the purpose of arrest was reasonable; no issue arose as to whether a warrant was necessary for either the arrest or the entry.

(1967). In short, the course of judicial development of the Fourth Amendment with respect to searches has remained true to the principles so well expressed by Mr. Justice Jackson:

> "Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers . . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948).

Since the Fourth Amendment speaks equally to both searches and seizures, and since an arrest, the taking hold of one's person, is quintessentially a seizure, it would seem that the constitutional provision should impose the same limitations upon arrests that it does upon searches. Indeed, as an abstract matter an argument can be made that the restrictions upon arrest perhaps should be greater. A search may cause only annoyance and temporary inconvenience to the law-abiding citizen, assuming more serious dimension only when it turns up evidence of criminality. An arrest, however, is a serious personal intrusion regardless of whether the person seized is guilty or innocent. Although an arrestee cannot be held for a significant period without some neutral determination that there are grounds to do so, see *Gerstein, supra,* no decision that he should go free can come quickly enough to erase the invasion of his privacy that already will have occurred. See *Chimel* v. *California,* 395 U. S. 752, 776 (1969) (WHITE, J., dissenting); cf. *United States* v.

*Robinson,* 414 U. S. 218, 237–238 (1973) (POWELL, J., concurring). Logic therefore would seem to dictate that arrests be subject to the warrant requirement at least to the same extent as searches.

But logic sometimes must defer to history and experience. The Court's opinion emphasizes the historical sanction accorded warrantless felony arrests. In the early days of the common law most felony arrests were made upon personal knowledge and without warrants. So established were such arrests as the usual practice that Lord Coke seriously questioned whether a justice of the peace, receiving his information secondhand instead of from personal knowledge, even could authorize an arrest by warrant. 4 E. Coke, Institutes 177 (6th ed. 1681). By the late 18th century it had been firmly established by Blackstone, with an intervening assist from Sir Matthew Hale, that magistrates could issue arrest warrants upon information supplied by others. 4 W. Blackstone, Commentaries *290; see 2 M. Hale, Pleas of the Crown *108–110. But recognition of the warrant power cast no doubt upon the validity of warrantless felony arrests, which continued to be practiced and upheld as before. 4 W. Blackstone, *supra,* at *282; 1 J. Chitty, Criminal Law *14–15. There is no historical evidence that the Framers or proponents of the Fourth Amendment, outspokenly opposed to the infamous general warrants and writs of assistance, were at all concerned about warrantless arrests by local constables and other peace officers. See N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 79–105 (1937); cf. *Gerstein* v. *Pugh,* 420 U. S., at 114–116. As the Court today notes, the Second Congress' passage of an Act authorizing such arrests [2] so soon after the adoption of the Fourth Amend-

---

[2] Act of May 2, 1792, c. 18, § 9, 1 Stat. 265; see 28 U. S. C. § 570.

ment itself underscores the probability that the constitutional provision was intended to restrict entirely different practices.

The historical momentum for acceptance of warrantless arrests, already strong at the adoption of the Fourth Amendment, has gained strength during the ensuing two centuries. Both the judiciary and the legislative bodies of this Nation repeatedly have placed their imprimaturs upon the practice and, as the Government emphasizes, law enforcement agencies have developed their investigative and arrest procedures upon an assumption that warrantless arrests were valid so long as based upon probable cause. The decision of the Court of Appeals in this case was virtually unprecedented.[3] Of course, no practice that is inconsistent with constitutional protections can be saved merely by appeal to previous uncritical acceptance. But the warrantless felony arrest, long preferred at common law and unimpeached at the passage of the Fourth Amendment, is not such a practice. Given the revolutionary implications of such a holding, a declaration at this late date that warrantless felony arrests are constitutionally infirm would have to rest upon reasons more substantial than a desire to harmonize the rules for arrest with those governing searches. Cf. *United States* v. *Robinson, supra,* at 230.

---

[3] Respondent has cited no other decision, state or federal, in support of the Court of Appeals' result in this case. The Government stated in its petition that the decision below was the first of which it was aware that required a warrant for an arrest in a public place. The Court of Appeals relied upon part of this Court's discussion in *Coolidge* v. *New Hampshire,* 403 U. S. 443, 480–481 (1971), but as other courts have recognized, that discussion had nothing to do with warrantless arrests in public places. See, *e. g., United States* v. *Miles,* 468 F. 2d 482, 486–487, and n. 6 (CA3 1972); *United States* v. *Bazinet,* 462 F. 2d 982, 987 (CA8), cert. denied *sub nom. Knox* v. *United States,* 409 U. S. 1010 (1972).

Moreover, a constitutional rule permitting felony arrests only with a warrant or in exigent circumstances could severely hamper effective law enforcement. Good police practice often requires postponing an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury.[4] Under the holding of the Court of Appeals such additional investigative work could imperil the entire prosecution. Should the officers fail to obtain a warrant initially, and later be required by unforeseen circumstances to arrest immediately with no chance to procure a last-minute warrant, they would risk a court decision that the subsequent exigency did not excuse their failure to get a warrant in the interim since they first developed probable cause. If the officers attempted to meet such a contin-

---

[4] This Court has not attempted a more precise definition of probable cause than the one in *Carroll* v. *United States*, 267 U. S., at 161, where the standard was affirmed as "facts and circumstances . . . such as to warrant a man of [reasonable] prudence and caution in believing that the offense has been committed" and, of course, that the person to be arrested was the offender. See generally *Henry* v. *United States*, 361 U. S., at 100–102. Whatever evidence may be necessary to establish probable cause in a given case, however, it is clear that it never need rise to the level required to prove guilt beyond a reasonable doubt. *Id.*, at 102; *Draper* v. *United States*, 358 U. S., at 311–312, and n. 4. The different standards for arrest and conviction reflect a recognition of society's valid interest in the earliest detention of suspected criminals that is consistent with the individual's interest in freedom from arbitrary interference with his liberty. See *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949). But society's equally valid interest in ultimate conviction of the guilty requires the police sometimes to continue their investigation after establishing probable cause to arrest, even if doing so means they have to leave a suspect at large pending such investigation. See generally ALI, A Model Code of Pre-arraignment Procedure § 120.1, Commentary, pp. 289, 292–296 (1975).

gency by procuring a warrant as soon as they had probable cause and then merely held it during their subsequent investigation, they would risk a court decision that the warrant had grown stale by the time it was used.[5] Law enforcement personnel caught in this squeeze could ensure validity of their arrests only by obtaining a warrant and arresting as soon as probable cause existed, thereby foreclosing the possibility of gathering vital additional evidence from the suspect's continued actions.

In sum, the historical and policy reasons sketched above fully justify the Court's sustaining of a warrantless arrest upon probable cause, despite the resulting divergence between the constitutional rule governing searches and that now held applicable to seizures of the person.[6]

## II

Finally, I share the view expressed in the opinion of MR. JUSTICE STEWART. It makes clear that we do not today consider or decide whether or under what circum-

---

[5] The probable cause to support issuance of an arrest warrant normally would not grow stale as easily as that which supports a warrant to search a particular place for particular objects. This is true because once there is probable cause to believe that someone is a felon the passage of time often will bring new supporting evidence. But in some cases the original grounds supporting the warrant could be disproved by subsequent investigation that at the same time turns up wholly new evidence supporting probable cause on a different theory. In those cases the warrant could be stale because based upon discredited information.

[6] I do not understand today's decision to suggest any retreat from our longstanding position that such an arrest should receive careful judicial scrutiny if challenged. "An arrest without a warrant bypasses the safeguards provided by an objective determination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest . . . , too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964).

stances an officer lawfully may make a warrantless arrest in a private home or other place where the person has a reasonable expectation of privacy.[7]

MR. JUSTICE STEWART, concurring in the result.

The arrest in this case was made upon probable cause in a public place in broad daylight. The Court holds that this arrest did not violate the Fourth Amendment, and I agree. The Court does *not* decide, nor could it decide in this case, whether or under what circumstances an officer must obtain a warrant before he may lawfully enter a private place to effect an arrest. See *Gerstein* v. *Pugh,* 420 U. S. 103, 113 n. 13; *Coolidge* v. *New Hampshire,* 403 U. S. 443, 474–481; *Davis* v. *Mississippi,* 394 U. S. 721, 728; *Jones* v. *United States,* 357 U. S. 493, 499–500.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

By granting police broad powers to make warrantless arrests, the Court today sharply reverses the course of our modern decisions construing the Warrant Clause of the Fourth Amendment. The Court turns next to the consent-to-search question last dealt with in *Schneckloth*

---

[7] Compare *Dorman* v. *United States,* 140 U. S. App. D. C. 313, 318–319, 435 F. 2d 385, 390–391 (1970) (en banc) (warrant required, absent exigent circumstances, for entry into a suspect's home for purpose of arrest), with *People* v. *Eddington,* 23 Mich. App. 210, 178 N. W. 2d 686 (1970), aff'd, 387 Mich. 551, 198 N. W. 2d 297 (1972) (only probable cause to arrest needed to enter suspect's home if there is a reasonable belief that he is there). Compare *England* v. *State,* 488 P. 2d 1347 (Okla. Crim. 1971) (search warrant needed to enter residence of third party to arrest suspect), with *United States* v. *Brown,* 151 U. S. App. D. C. 365, 369, 467 F. 2d 419, 423 (1972) (only an arrest warrant, plus reasonable belief that the suspect is present, necessary to support entry onto third party's premises).

v. *Bustamonte,* 412 U. S. 218 (1973). Without acknowl-
edgment or analysis, the Court extends the scope of that
decision to the situation expressly reserved in *Schneck-
loth,* and creates a rule inconsistent with *Schneck-
loth*'s own analysis. The Court takes both steps with
a remarkable lack of consideration of either the facts of
this case or the constitutional questions it is deciding.
That is unfortunate not only because, in my view, the
Court decides the constitutional questions wrongly, but
also because consideration would have shown that the
first question decided today is not raised by the facts
before us, and that the second question should not be
resolved here, given the present posture of this case. I
respectfully dissent.

I

Before addressing what the Court does today, I note
what it does not do. It does not decide this case on
the narrow question that is presented. That is unfor-
tunate for this is, fundamentally, a simple case.

On the afternoon of August 23, 1972, Awad Khoury,
an informant of proved reliability, met with respondent
Watson at a public restaurant under the surveillance of
two postal inspectors. Khoury was under instructions
to light a cigarette as a signal to the watching agents
if Watson was in possession of stolen credit cards.
Khoury lit a cigarette, and the postal inspectors moved
in, made the arrest, and, ultimately, discovered under
the floor mat of Watson's automobile the stolen credit
cards that formed the basis of Watson's conviction and
this appeal.

The signal of the reliable informant that Watson was
in possession of stolen credit cards gave the postal inspec-
tors probable cause to make the arrest. This probable
cause was separate and distinct from the probable cause
relating to the offense six days earlier, and provided an

adequate independent basis for the arrest. Whether or not a warrant ordinarily is required prior to making an arrest, no warrant is required when exigent circumstances are present. When law enforcement officers have probable cause to believe that an offense is taking place in their presence and that the suspect is at that moment in possession of the evidence, exigent circumstances exist. Delay could cause the escape of the suspect or the destruction of the evidence. Accordingly, Watson's warrantless arrest was valid under the recognized exigent-circumstances exception to the warrant requirement, and the Court has no occasion to consider whether a warrant would otherwise be necessary.[1]

This conclusion should properly dispose of the case before us. As the Court observes, *ante,* at 414, the Court of Appeals relied heavily on the supposed illegality of Watson's arrest in ruling that his consent to the search of his car was coerced. Neither the opinion of the Court of Appeals nor the briefs of the parties here address the remaining issue of the circumstances under which consent to search given by a suspect *lawfully* in custody may be deemed coerced. Since that issue is both complex and

---

[1] The Court of Appeals did not recognize this independent probable cause to arrest petitioner, perhaps because one of the arresting officers testified that the arrest was made for the earlier, rather than the contemporaneous, offense. App. 23–24. That testimony should not limit the inquiry into contemporaneous probable cause. Where the good faith of the arresting officers is not at issue, and where the crime for which a suspect is arrested and that for which the officers have probable cause are closely related, courts typically use an objective rather than subjective measure of probable cause. *Ramirez* v. *Rodriguez,* 467 F. 2d 822 (CA10 1972); *United States* v. *Martinez,* 465 F. 2d 79 (CA2 1972); *United States* v. *Atkinson,* 450 F. 2d 835, 838 (CA5 1971). Since the objective facts demonstrably show probable cause as to the contemporaneous offense as well as the earlier offense, Watson's arrest is properly justified by reference to those facts.

expressly reserved in *Schneckloth* v. *Bustamonte, supra,* I think it inappropriate for resolution without the benefit of the views of the parties and the Court of Appeals. Accordingly, I would reverse the Court of Appeals on the legality of the arrest, vacate its judgment, and remand the case to that court for further proceedings.

## II

Since, for reasons it leaves unexpressed, the Court does not take this traditional course, I am constrained to express my views on the issues it unnecessarily decides. The Court reaches its conclusion that a warrant is not necessary for a police officer to make an arrest in a public place, so long as he has probable cause to believe a felony has been committed, on the basis of its views of precedent and history. As my Brother POWELL correctly observes, *ante,* at 426–427, n. 1 (concurring), the precedent is spurious. None of the cases cited by the Court squarely confronted the issue decided today. Moreover, an examination of the history relied on by the Court shows that it does not support the conclusion laid upon it. After showing why, in my view, the Court's rationale does not support today's result, I shall examine the relevant decisions and suggest what I believe to be the proper rule for arrests.

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

There is no doubt that by the reference to the seizure of persons, the Fourth Amendment was intended to

apply to arrests. *Ex parte Burford,* 3 Cranch 448 (1806). See generally N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 79–82 (1937). Indeed, we have often considered whether arrests were made in conformity with the Fourth Amendment. *E. g., Beck* v. *Ohio,* 379 U. S. 89 (1964); *Ker* v. *California,* 374 U. S. 23 (1963); *Draper* v. *United States,* 358 U. S. 307 (1959); *Giordenello* v. *United States,* 357 U. S. 480 (1958). Admittedly, as the Court observes, some of our decisions make passing reference to the common-law rule on arrests. *E. g., Carroll* v. *United States,* 267 U. S. 132, 156 (1925); *Bad Elk* v. *United States,* 177 U. S. 529, 534 (1900); *Kurtz* v. *Moffitt,* 115 U. S. 487, 498–499 (1885). However, none of the cases cited by the Court, nor any other warrantless arrest case in this Court, mandates the decision announced today. Frequently exigent circumstances were present, so that the warrantless arrest was proper even if a warrant ordinarily may be required. *Ker* v. *California, supra; Draper* v. *United States, supra; United States* v. *Di Re,* 332 U. S. 581 (1948). Many cases have invalidated arrests as not based on probable cause, thereby bypassing the need to reach the warrant question. *E. g., Beck* v. *Ohio, supra; Henry* v. *United States,* 361 U. S. 98 (1959). Elsewhere the Court has simply assumed the propriety of the arrest and resolved the case before it on other grounds. *Chimel* v. *California,* 395 U. S. 752 (1969). Cf. *Coolidge* v. *New Hampshire,* 403 U. S. 443, 476 (1971). And in other cases, the Court noted, but did not reach, the warrantless-arrest issue, *E. g., Giordenello* v. *United States, supra.* In sum, as the case-by-case analysis undertaken by my Brother POWELL demonstrates, the dicta relied upon by the Court in support of its decision today are just that—dicta. See *ante,* at 426–427, n. 1 (concurring). They are no substitute

for reasoned analysis of the relationship between the warrant requirement and the law of arrest.

The Court next turns to history. It relies on the English common-law rule of arrest and the many state and federal statutes following it. There are two serious flaws in this approach. First, as a matter of factual analysis, the substance of the ancient common-law rule provides no support for the far-reaching modern rule that the Court fashions on its model. Second, as a matter of doctrine, the longstanding existence of a Government practice does not immunize the practice from scrutiny under the mandate of our Constitution.

The common-law rule was indeed as the Court states it:

> "[A] peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." *Ante,* at 418, and sources cited.

See also *Kurtz* v. *Moffitt, supra; Bad Elk* v. *United States, supra.* To apply the rule blindly today, however, makes as much sense as attempting to interpret Hamlet's admonition to Ophelia, "Get thee to a nunnery, go," [2] without understanding the meaning of Hamlet's words in the context of their age.[3] For the fact is that a felony at common law and a felony today bear only slight resemblance, with the result that the relevance of the common-law rule of arrest to the modern interpretation of our Constitution is minimal.

Both at common law and today, felonies find definition in the penal consequences of crime rather than the

---

[2] W. Shakespeare, Hamlet, act iii, sc. 1, line 142.

[3] Nunnery was Elizabethan slang for house of prostitution. 7 Oxford English Dictionary 264 (1933).

nature of the crime itself. At common law, as this Court has several times recognized,

> "No crime was considered a felony which did not occasion a total forfeiture of the offender's lands, or goods, or both." *Kurtz* v. *Moffitt,* 115 U. S., at 499.

See also *Ex parte Wilson,* 114 U. S. 417, 423 (1885); 4 W. Blackstone, Commentaries *95.[4] At present, on the other hand,

> "Any offense punishable by death or imprisonment for a term exceeding one year is a felony." 18 U. S. C. § 1 (1).[5]

This difference reflects more than changing notions of penology. It reflects a substantive change in the kinds of crimes called felonies. *Carroll* v. *United States,* 267 U. S., at 158.[6] Only the most serious crimes were felonies at common law, and many crimes now clas-

---

[4] Professor Wilgus has defined felonies at common law as

"those bootless crimes, prosecuted by an appeal with an offer of trial by battle, the felon's lands to go to his lord or the king, his chattels confiscated, and life and members forfeited, if guilty, and if he fled he became an outlaw . . . ." Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 569 (1924).

[5] In the States the most common rule is that any crime punishable by death or imprisonment in the state prison is a felony. See *id.,* at 571. See also, *e. g.,* Ark. Stat. Ann. § 41–103 (1964); 22 Fla. Stat. Ann. § 775.08 (Supp. 1975); Ill. Ann. Stat. § 2–7 (Supp. 1975); Ky. Rev. Stat. Ann. § 431.060 (1970); Mass. Gen. Laws Ann., c. 274, § 1 (1970); Okla. Stat. Ann., Tit. 21, § 5 (1958); Wash. Rev. Code § 9.01.020 (1974).

[6] "In England at the common law the difference in punishment between felonies and misdemeanors was very great. Under our present federal statutes, it is much less important and Congress may exercise a relatively wide discretion in classing particular offenses as felonies or misdemeanors." *Carroll* v. *United States,* 267 U. S., at 158.

sified as felonies under federal or state law were treated as misdemeanors. Professor Wilgus has summarized and documented the cases:

> "At common law an assault was a misdemeanor and it was still only such even if made with the intent to rob, murder, or rape. Affrays, abortion, barratry, bribing voters, challenging to fight, compounding felonies, cheating by false weights or measures, escaping from lawful arrest, eavesdropping, forgery, false imprisonment, forcible and violent entry, forestalling, kidnapping, libel, mayhem, maliciously killing valuable animals, obstructing justice, public nuisance, perjury, riots and routs, etc. were misdemeanors . . . ." Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 572–573 (1924) (footnotes omitted).

See also 9 Halsbury's Laws of England 450–793 (1909).[7] To make an arrest for any of these crimes at common law, the police officer was required to obtain a warrant, unless the crime was committed in his presence.[8] Since many of these same crimes are commonly classified as felonies today,[9] however, under the Court's holding a

---

[7] Indeed, by statute, it was no more than a high misdemeanor wilfully to discharge or attempt to discharge a pistol at or near the King of England. 9 Halsbury's Laws of England 459 (1909). Cf. 18 U. S. C. § 871 (felony to make threats against President of United States); § 1751 (felony to assault President of United States).

[8] This exception was essentially a narrowly drawn exigent-circumstances exception. See *Carroll* v. *United States, supra,* at 157.

[9] For example, under federal law these are some of the common-law misdemeanors, or their modern equivalents, now considered felonies: assault, 18 U. S. C. §§ 111–112; assault with intent to commit murder, rape or any other felony, § 113; forging securities of the United States, § 471; bribing voters, § 597; escape, § 751; kidnaping, § 1201; obstruction of congressional or executive investi-

warrant is no longer needed to make such arrests, a result in contravention of the common law.

Thus the lesson of the common law, and those courts in this country that have accepted its rule, is an ambiguous one. Applied in its original context, the common-law rule would allow the warrantless arrest of some, but not all, of those we call felons today. Accordingly, the Court is simply historically wrong when it tells us that "[t]he balance struck by the common law in generally authorizing felony arrests on probable cause, but without a warrant, has survived substantially intact." *Ante*, at 421. As a matter of substance, the balance struck by the

---

gations, § 1505; obstruction of criminal investigations, § 1510; perjury, § 1621; riots, § 2101; interception of wire or oral communications, § 2511.

See also, *e. g.*, Ark. Stat. Ann. § 41–606 (1964) (assault with intent to kill); § 41–607 (assault with intent to rape); § 41–1805 (forgery); § 41–3005 (perjury); § 41–2308 (Supp. 1973) (kidnaping).

Fla. Stat. Ann. § 787.02 (Supp. 1975) (false imprisonment); § 831.01 (Supp. 1975) (forgery); § 837.012 (Supp. 1975) (perjury); § 843.14 (Supp. 1975) (compounding felonies); § 870.03 (Supp. 1975) (riots and routs).

Ill. Ann. Stat. § 10–1 (Supp. 1975) (kidnaping); § 14–4 (eavesdropping); § 33–1 (Supp. 1975) (bribery); § 32–2 (Supp. 1975) (perjury).

Ky. Rev. Stat. § 520.020 (1975) (escape); § 516.020 (1975) (forgery); § 509.020 (1975) (kidnaping); § 515.020 (1975) (assault with intent to rob); § 523.020 (1975) (perjury).

Mass. Gen. Laws Ann., c. 265, § 29 (1970) (assault with intent to commit a felony); c. 268, § 36 (compounding felonies); c. 268, § 13B (obstructing justice); c. 267, § 1 (Supp. 1975) (forgery); c. 272, § 99 (interception of wire and oral communications); c. 268, § 16 (Supp. 1975) (escape); c. 265, § 26 (Supp. 1975) (kidnaping).

Okla. Stat. Ann., Tit. 21, § 443 (Supp. 1975) (escape); § 499 (1958) (perjury); § 653 (Supp. 1975) (assault with intent to kill); § 1312 (1958) (riot); § 1621 (1958) (forgery). Wash. Rev. Code § 9.11.010 (1974) (assault with intent to commit a felony); § 9.27.-050 (riot); § 9.31.010 (escape); § 9.44.020 (forgery); § 9.52.010 (kidnaping); § 9.72.010 (perjury).

common law in accommodating the public need for the most certain and immediate arrest of criminal suspects with the requirement of magisterial oversight to protect against mistaken insults to privacy decreed that only in the most serious of cases could the warrant be dispensed with. This balance is not recognized when the common-law rule is unthinkingly transposed to our present classifications of criminal offenses. Indeed, the only clear lesson of history is contrary to the one the Court draws: the common law considered the arrest warrant far more important than today's decision leaves it.

I do not mean by this that a modern warrant requirement should apply only to arrests precisely analogous to common-law misdemeanors, and be inapplicable to analogues of common-law felonies. Rather, the point is simply that the Court's unblinking literalism cannot replace analysis of the constitutional interests involved. While we can learn from the common law, the ancient rule does not provide a simple answer directly transferable to our system. Thus, in considering the applicability of the common-law rule to our present constitutional scheme, we must consider *both* of the rule's two opposing constructs: the presumption favoring warrants, as well as the exception allowing immediate arrests of the most dangerous criminals. The Court's failure to do so, indeed its failure to recognize any tension in the common-law rule at all, drains all validity from its historical analysis.

Lastly, the Court relies on the numerous state and federal statutes codifying the common-law rule. But this, too, is no substitute for reasoned analysis. True enough, the national and state legislatures have steadily ratified the drift of the balance struck by the common-law rule past the bounds of its original intent. And it is true as well, as the Court observes, that a presumption of constitutionality attaches to every Act of Congress. But neither observation is determinative of the constitutional issue,

and the doctrine of deference that the Court invokes is contrary to the principles of constitutional analysis practiced since *Marbury* v. *Madison,* 1 Cranch 137 (1803). The Court's error on this score is far more dangerous than its misreading of history, for it is well settled that the mere existence of statutes or practice, even of long standing, is no defense to an unconstitutional practice. "[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it." *Walz* v. *Tax Comm'n,* 397 U. S. 664, 678 (1970). See also *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973); *Roe* v. *Wade,* 410 U. S. 113 (1973); *Furman* v. *Georgia,* 408 U. S. 238 (1972); *Reynolds* v. *Sims,* 377 U. S. 533 (1964).[10] Our function in constitutional cases is weightier than the Court today suggests: where reasoned analysis shows a practice to be constitutionally deficient, our obligation is to the Constitution, not the Congress.

In sum, the Court's opinion is without foundation. It relies on precedents that are not precedents. It relies on history that offers no clear rule to impose, but only conflicting interests to balance. It relies on statutes that constitute, at best, no more than an aid to construction. The Court never grapples with the warrant requirement of the Fourth Amendment and the cases construing it. It simply announces, by *ipse dixit,* a rule squarely rejecting the warrant requirement we have favored for so long.

## III

My Brother Powell concludes: "Logic . . . would seem to dictate that arrests be subject to the warrant

---

[10] "It is clear, of course, that no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez* v. *United States,* 413 U. S., at 272.

requirement at least to the same extent as searches."
*Ante,* at 429 (concurring). I agree.

One of the few absolutes of our law is the requirement
that, absent the presence of one of a few "jealously and
carefully drawn" exceptions, *Jones* v. *United States,* 357
U. S. 493, 499 (1958), a warrant be obtained prior to
any search.[11] "[E]xcept in certain carefully defined
classes of cases, a search of private property without
proper consent is 'unreasonable' [within the meaning of
the Fourth Amendment] unless it has been authorized
by a valid search warrant." *Camara* v. *Municipal Court,*
387 U. S. 523, 528–529 (1967). See *Cady* v. *Dombrow-
ski,* 413 U. S. 433, 439 (1973); *United States* v. *United
States District Court,* 407 U. S. 297, 315–316, 318 (1972);
*Coolidge* v. *New Hampshire,* 403 U. S., at 454–455;
*Chimel* v. *California,* 395 U. S., at 762; *Terry* v.
*Ohio,* 392 U. S. 1 (1968); *Katz* v. *United States,* 389
U. S. 347, 357 (1967).

The rule the Court announces today for arrests is the
reverse of this approach. It is, in essence, the *Rabino-
witz* rule: "The relevant test is not whether it is rea-
sonable to procure [an arrest] warrant, but whether
the [arrest] was reasonable." *United States* v. *Rabino-
witz,* 339 U. S. 56, 66 (1950). In the search context,
*Rabinowitz* has been overruled, *Chimel* v. *California,*
*supra,* at 764–768, and thoroughly discredited, see,
*e. g., United States* v. *United States District Court,*
*supra,* at 315, and n. 16. The *Rabinowitz* ap-
proach simply does not provide adequate protection for
the important personal privacy interests codified in the

---

[11] "[S]earches conducted outside the judicial process, without prior
approval by judge or magistrate, are *per se* unreasonable under the
Fourth Amendment—subject only to a few specifically established
and well-delineated exceptions." *Katz* v. *United States,* 389 U. S.
347, 357 (1967).

Fourth Amendment. Given "[t]he history of the use, and not infrequent abuse, of the power to arrest," *Wong Sun* v. *United States,* 371 U. S. 471, 479 (1963), and the fact that arrests are, in terms, as fully governed by the Fourth Amendment as searches, the logical presumption is that arrests and searches should be treated equally under the Fourth Amendment. Analysis of the interests involved confirms this supposition.

The Court has typically engaged in a two-part analysis in deciding whether the presumption favoring a warrant should be given effect in situations where a warrant has not previously been clearly required. Utilizing that approach we must now consider (1) whether the privacy of our citizens will be better pròtected by ordinarily requiring a warrant to be issued before they may be arrested; and (2) whether a warrant requirement would unduly burden legitimate governmental interests. *United States* v. *United States District Court, supra,* at 315; *Camara* v. *Municipal Court, supra,* at 533.

The first question is easily answered. Of course, the privacy of our citizens will be better protected by a warrant requirement. We have recognized that "the Fourth Amendment protects people, not places." *Katz* v. *United States, supra,* at 351. Indeed, the privacy guaranteed by the Fourth Amendment is quintessentially personal. Cf. *Roe* v. *Wade, supra; Doe* v. *Bolton,* 410 U. S. 179 (1973); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965). Thus a warrant is required in search situations not because of some high regard for property, but because of our regard for the individual, and *his* interest in his possessions and person.

> "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and

private property, where that right has never been forfeited by his conviction of some public offense,— it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment [in the classic English warrant case of *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (1765)]." *Boyd* v. *United States,* 116 U. S. 616, 630 (1886).

Not only is the Fourth Amendment directly addressed to the privacy of our citizens, but it speaks in indistinguishable terms about the freedom of both persons and property from unreasonable seizures. A warrant is required in the search situation to protect the privacy of the individual, but there can be no less invasion of privacy when the individual himself, rather than his property, is searched and seized. Indeed, an unjustified arrest that forces the individual temporarily to forfeit his right to control his person and movements and interrupts the course of his daily business may be more intrusive than an unjustified search.

> "Being arrested and held by the police, even if for a few hours, is, for most persons, awesome and frightening. Unlike other occasions on which one may be authoritatively required to be somewhere or do something, an arrest abruptly subjects a person to constraint, and removes him to unfamiliar and threatening surroundings. Moreover, this exercise of control over the person depends not just on his willingness to comply with an impersonal directive, such as a summons or subpoena, but on an order which a policeman issues on the spot and stands ready then and there to back up with force. The security of the individual requires that so abrupt and intrusive an authority be granted to public officials only on a guarded basis." ALI, Model Code

of Pre-arraignment Procedure, Commentary 290–291 (1975).

A warrant requirement for arrests would, of course, minimize the possibility that such an intrusion into the individual's sacred sphere of personal privacy would occur on less than probable cause. Primarily for this reason, a warrant is required for searches. Surely there is no reason to place greater trust in the partisan assessment of a police officer that there is probable cause for an arrest than in his determination that probable cause exists for a search.[12]  Last Term the Court unanimously recog-

---

[12] In fact, the reasons relating to personal privacy so often itemized by the Court in requiring a warrant to search appear to apply with equal force to arrests. In *Johnson* v. *United States*, 333 U. S. 10 (1948), Mr. Justice Jackson laid down the reasons for a search warrant in these classic lines:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Id.*, at 13–14.

Substitute "arrest" for "search" and replace references to the home with references to the person, and the justification for an arrest warrant compellingly emerges.

nized that detention of a person cannot be prolonged without judicial oversight of the probable-cause determination. *Gerstein* v. *Pugh,* 420 U. S. 103 (1975). But while *Gerstein* may provide the best protection possible against less-than-probable-cause warrantless arrests based on exigent circumstances, it does not fully protect the Fourth Amendment rights at stake here. A less-than-probable-cause arrest followed by a *Gerstein* release is as offensive to the Fourth Amendment as a less-than-probable-cause search that fails to uncover the evidence sought, and the requirement of a warrant is as instrumental in protecting against the one as the other. Indeed, the Court's opinion in *Gerstein* expressly recognizes that maximum protection of individual rights can only be realized "by requiring a magistrate's review of the factual justification prior to any arrest . . . ." *Id.,* at 113.

We come then to the second part of the warrant test: whether a warrant requirement would unduly burden legitimate law enforcement interests. Dicta in *Gerstein* answer this question in the affirmative, and these concerns are somewhat amplified in the concurrence of my Brother POWELL. *Ante,* at 431–432. I believe, however, that the suggested concerns are wholly illusory. Indeed, the argument that a warrant requirement for arrests would be an onerous chore for the police seems somewhat anomalous in light of the Government's concession that "it is the standard practice of the Federal Bureau of Investigation [FBI] to present its evidence to the United States Attorney, and to obtain a warrant, before making an arrest." Brief for United States 26 n. 15. In the past, the practice and experience of the FBI have been taken as a substantial indication that no intolerable burden would be presented by a proposed rule of procedure. *Miranda* v. *Arizona,* 384 U. S. 436, 483–486 (1966).

There is no reason to accord less deference to the FBI practice here.[13]

The Government's assertion that a warrant requirement would impose an intolerable burden stems, in large part, from the specious supposition that procurement of an arrest warrant would be necessary as soon as probable cause ripens. Brief for United States 22–24. There is no requirement that a search warrant be obtained the moment police have probable cause to search. The rule is only that present probable cause be shown and a warrant obtained before a search is undertaken.[14] Fed. Rule Crim. Proc. 41. Cf. *Berger* v. *New York*, 388 U. S. 41, 59 (1967). The same rule should obtain for arrest warrants, where it may even make more sense. Certainly, there is less need for prompt procurement of a warrant in the arrest situation. Unlike probable cause to search, probable cause to arrest, once formed, will continue to exist for the indefinite future, at least if no intervening exculpatory facts come to light. See *Wilson* v. *United States*, 117 U. S. App. D. C. 28, 325 F. 2d 224 (1963), cert. denied, 377 U. S. 1005 (1964), and

---

[13] The *Miranda* Court rejected as irrelevant the argument that the FBI deals with crimes different from those dealt with by state authorities. 384 U. S., at 486.

[14] The police will, however, encounter problems of "staleness" of their information if they delay too long in seeking a search warrant. *E. g., Sgro* v. *United States*, 287 U. S. 206 (1932); *United States* v. *Sawyer*, 213 F. Supp. 38, 40 (ED Pa. 1963). See generally Annot., 100 A. L. R. 2d 525 (1965). But see *People* v. *Wright*, 367 Mich. 611, 116 N. W. 2d 786 (1962). This problem relates, however, to the existence at the time the warrant is applied for of probable cause to believe the object to be seized remains where it was, not to whether the earlier probable cause mandated immediate application for a warrant. Mascolo, The Staleness of Probable Cause in Affidavits for Search Warrants: Resolving the Issue of Timeliness, 43 Conn. B. J. 189 (1969). This problem has no bearing, of course, in connection with a warrant to arrest.

*United States* v. *Wilson,* 342 F. 2d 782 (CA2 1965) (both upholding delay of 16 months between formation of probable cause and issuance of arrest warrant). Cf. *Hoffa* v. *United States,* 385 U. S. 293, 310 (1966).

This sensible approach obviates most of the difficulties that have been suggested with an arrest warrant rule. Police would not have to cut their investigation short the moment they obtain probable cause to arrest, nor would undercover agents be forced suddenly to terminate their work and forfeit their covers. *Godfrey* v. *United States,* 123 U. S. App. D. C. 219, 358 F. 2d 850 (1966). Moreover, if in the course of the continued police investigation exigent circumstances develop that demand an immediate arrest, the arrest may be made without fear of unconstitutionality, so long as the exigency was unanticipated and not used to avoid the arrest warrant requirement. Cf. *Coolidge* v. *New Hampshire,* 403 U. S., at 469–471 (evidence may be seized if in plain view only if its discovery is inadvertent). Likewise, if in the course of the continued investigation police uncover evidence tying the suspect to another crime, they may immediately arrest him for that crime if exigency demands it, and still be in full conformity with the warrant rule. This is why the arrest in this case was not improper.[15] Other than where police attempt to evade the warrant requirement, the rule would invalidate an arrest only in the obvious situation: where police, with probable cause but without exigent circumstances, set out to arrest a suspect. Such an arrest must be void, even if exigency develops in the course of the arrest that

---

[15] Although the postal inspectors here anticipated the occurrence of the second crime, they could not have obtained a warrant for Watson's arrest for that crime until probable cause formed, just moments before the arrest. A warrant based on anticipated facts is premature and void. *United States* v. *Roberts,* 333 F. Supp. 786 (ED Tenn. 1971).

would ordinarily validate it; otherwise the warrant requirement would be reduced to a toothless prescription.

In sum, the requirement that officers about to arrest a suspect ordinarily obtain a warrant before they do so does not seem unduly burdensome, at least no more burdensome than any other requirement that law enforcement officials undertake a new procedure in order to comply with the dictates of the Constitution. Cf. *Gerstein* v. *Pugh,* 420 U. S. 103 (1975); *United States* v. *Wade,* 388 U. S. 218 (1967); *Gilbert* v. *California,* 388 U. S. 263 (1967); *Miranda* v. *Arizona, supra; Gideon* v. *Wainwright,* 372 U. S. 335 (1963).

It is suggested, however, that even if application of this rule does not require police to secure a warrant as soon as they obtain probable cause, the confused officer would nonetheless be prone to do so. If so, police "would risk a court decision that the warrant had grown stale by the time it was used." *Ante,* at 432 (POWELL, J., concurring) (footnote omitted). This fear is groundless. First, as suggested above, the requirement that police procure a warrant before an arrest is made is rather simple of application. Thus, there is no need for the police to find themselves in this "squeeze." Second, the "squeeze" is nonexistent. Just as it is virtually impossible for probable cause for an arrest to grow stale between the time of formation and the time a warrant is procured, it is virtually impossible for probable cause to become stale between procurement and arrest.[16] Delay by law enforcement officers in executing an arrest warrant does not ordinarily affect the legality of the arrest.[17]

---

[16] Thus, unlike a search warrant, an arrest warrant typically does not require execution within a specified time period or "forthwith." Compare Fed. Rule Crim. Proc. 41 (c) with Rules 4 and 9.

[17] Pre-arrest delay may violate a defendant's due process rights and cause dismissal of the charges if the delay is such as to impair the defendant's ability to defend himself or is deliberate and

*United States* v. *Wilson, supra; Wilson* v. *United States, supra; Carlo* v. *United States,* 286 F. 2d 841, 846 (CA2), cert. denied, 366 U. S. 944 (1961); *United States* v. *Joines,* 258 F. 2d 471 (CA3), cert. denied, 358 U. S. 880 (1958); *Giordenello* v. *United States,* 241 F. 2d 575 (CA5 1957), rev'd on other grounds, 357 U. S. 480 (1958). In short, staleness should be the least of an arresting officer's worries.[18]

Thus, the practical reasons marshaled against an arrest warrant requirement are unimpressive.[19] If anything, the virtual nonexistence of a staleness problem suggests that such a requirement would be less burdensome for police than the search warrant rule. And given the significant protection our citizens will gain from a warrant requirement, accepted Fourth Amend-

---

unjustified. *United States* v. *Feinberg,* 383 F. 2d 60, 65 (CA2 1967), cert. denied, 389 U. S. 1044 (1968); *United States* v. *Harbin,* 377 F. 2d 78 (CA4 1967); *Godfrey* v. *United States,* 123 U. S. App. D. C. 219, 358 F. 2d 850 (1966); *Powell* v. *United States,* 122 U. S. App. D. C. 229, 231, 352 F. 2d 705, 707 (1965). The effect of such delay, however, is completely unrelated to the warrant question.

[18] It is suggested that staleness would be most serious in situations where the original probable cause justifying a warrant is undercut by exculpatory evidence, only to be reaffirmed by further inculpatory evidence. Why this should be a problem baffles me. It should be obvious that when the probable cause supporting a warrant no longer exists, the warrant is void and the suspect cannot be arrested. That probable cause is thereafter again found only tells us that, absent exigency, a subsequent warrant should be obtained, not that the void warrant should somehow be resurrected. Cf. *Sgro* v. *United States,* 287 U. S. 206 (1932).

[19] The fear that "endless litigation" will result from a warrant rule cannot be credited as an additional practical reason against such a rule. Cf. *ante,* at 423–424. Recognition of a constitutional right inevitably results in litigation to enforce that right. We would quickly lose all protection from our Constitution if it could successfully be argued that its guarantees should be ignored because if they were recognized our citizens would begin to assert them.

ment analysis dictates that a warrant rule be imposed. This conclusion, then, answers the questions posed by analysis of the common-law rule on arrest. In choosing between the common law's prescription that a warrant ordinarily be obtained for the arrest of persons suspected of committing less serious crimes, and the common-law exception allowing warrantless arrests of suspects in more serious offenses, the intervention of our Fourth Amendment and the cases developing its application necessarily favor the former approach. Thus, I believe the proper result is application of the warrant requirement, as it has developed in the search context, to all arrests.

## IV

Accordingly, I dissent from the Court's contrary holding. It is always disheartening when the Court ignores a relevant body of precedent and eschews any considered analysis. It is more so when the result of such an approach is a rule that "leave[s] law-abiding citizens at the mercy of the officers' whim or caprice," *Brinegar* v. *United States,* 338 U. S. 160, 176 (1949), and renders the constitutional protection of our "persons" a nullity. The consequences of the Court's casually adopted rationale are clear.

First, the opinion all but answers the question raised in *Coolidge* v. *New Hampshire,* 403 U. S., at 480–481, namely, "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." *Gerstein* v. *Pugh,* 420 U. S., at 113 n. 13.[20]

---

[20] The Court of Appeals relied on language from *Coolidge* v. *New Hampshire,* to support its conclusion that a warrant was required to arrest Watson:

"Indeed, if MR. JUSTICE WHITE is correct that it has generally been assumed that the Fourth Amendment is not violated by the

Admittedly, my Brothers STEWART and POWELL do not read the opinion to resolve that issue and, indeed, the Court purports to leave it open. *Ante,* at 418 n. 6. But the mode of analysis utilized here—reliance on the common law and federal and state statutes—provides a ready answer, as indeed the Court hints by its extended discussion of § 120.6 of the ALI Model Code of Pre-arraignment Procedure and its relevant commentary. *Ante,* at 418 n. 6. See also Wilgus, 22 Mich. L. Rev., at 800 ("For a felony . . . one may break into the dwelling house to take the felon . . ."); *id.,* at 558, 803; 9 Halsbury's Laws of England 307 (1909); 1 J. Chitty, Criminal Law *23; 4 W. Blackstone, Commentaries *292. Unless the approach of this opinion is to be fundamentally rejected, it will be difficult, if not impossible, to follow these sources to any but one conclusion—that entry to effect a warrantless arrest is permissible.

Second, by paying no attention whatever to the substance of the offense, and considering only whether it is labeled "felony," the Court, in the guise of "constitutionalizing" the common-law rule, actually does away with it altogether, replacing it with the rule that the police may, consistent with the Constitution, arrest on probable cause anyone who they believe has committed any sort of crime at all. Certainly this rule would follow

---

warrantless entry of a man's house for purposes of arrest, it might be wise to re-examine the assumption. . . .

". . . The case of *Warden* v. *Hayden,* [387 U. S. 294 (1967),] where the Court elaborated a 'hot pursuit' justification for the police entry into the defendant's house without a warrant for his arrest, certainly stands by negative implication for the proposition that an arrest warrant is required in the absence of exigent circumstances." 403 U. S., at 480–481.

The Court is correct that this language relates only to the question reserved both in *Gerstein* v. *Pugh,* 420 U. S., at 113 n. 13, and in this case.

if the legislatures redenominated all crimes as "felonies." As a matter of substance, it would seem to follow in any event from the holding of this case, for the Court surely does not intend to accord constitutional status to a distinction that can be readily changed by legislative fiat.[21]

Lastly, the Court surrenders the opportunity to put teeth in our oft-expressed preference for the use of arrest warrants. *Beck* v. *Ohio,* 379 U. S., at 96; *Wong Sun* v. *United States,* 371 U. S., at 479–482. While some incentives for police to obtain arrest warrants remain,[22]

---

[21] Thus the Court calls into question the line of state cases holding unconstitutional statutes authorizing warrantless arrests for misdemeanors not committed in the presence of the arresting officer. *In re Kellam,* 55 Kan. 700, 41 P. 960 (1895); *Robison* v. *Miner,* 68 Mich. 549, 37 N. W. 21 (1888); *Pinkerton* v. *Verberg,* 78 Mich. 573, 44 N. W. 579 (1889); *Gunderson* v. *Struebing,* 125 Wis. 173, 104 N. W. 149 (1905); *Ex parte Rhodes,* 79 So. 462 (Ala. 1918). Of course, such a result (or, indeed, the result I espouse herein) may still be sustained under the pertinent provisions of the state constitution. Cf. *Oregon* v. *Hass,* 420 U. S. 714, 726 (1975) (MARSHALL, J., dissenting).

[22] After today there are two primary incentives for the police to obtain an arrest warrant. First, the Court has suggested, but never held, that a stronger showing of probable cause may be needed to justify a warrantless arrest than would be required if a warrant had been obtained. *Wong Sun* v. *United States,* 371 U. S. 471, 479–480 (1963). Cf. *United States* v. *Ventresca,* 380 U. S. 102, 106 (1965) (searches). This two-tier standard of probable cause may prove too slippery for ready application, however, especially given the already imprecise definition of probable cause itself, *Carroll* v. *United States,* 267 U. S., at 161. What the Court intends, I suspect, is simply that the evidence of probable cause supporting a warrantless arrest will be subjected to closer scrutiny than that underlying a warrant-supported arrest.

The second incentive for police to obtain a warrant is that they may desire to present their evidence to a magistrate so as to be sure that they have probable cause. If probable cause is lacking, the police will then have an opportunity to gather more evidence

they are only indirect and have proved ineffective in the past in assuring routine application for arrest warrants when the circumstances permit it. By our holding today, the preference for an arrest warrant, which the Court has conceded is the optimal method to protect our citizens from the affront of an unlawful arrest, will remain only an ideal, one that the Court will espouse but not enforce.

## V

Having disposed of the suggestion that the Fourth Amendment requires a warrant of arrest before the police may seize our persons, the Court turns its attention, briefly, to whether Watson voluntarily consented to the search of his automobile. I have suggested above that because this issue is of some complexity and has not been thoroughly briefed for us I would remand this case for initial consideration of the question by the Court of Appeals. The Court, however, finds the question simplicity itself. It applies the "totality of the circumstances" test established in *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973), and treats the question as merely requiring the application of settled law to the facts before us.

That is not the case. Watson was in custody when his consent was obtained. The lack of custody was of decisional importance in *Schneckloth,* which repeatedly distinguished the case before it from one involving a suspect in custody. *Id.,* at 232, 240–241, and n. 29, 246–248, and n. 36. The Court held:

> "Our decision today is a narrow one. We hold only that *when the subject of a search is not in custody* and the State attempts to justify a search on the basis of his consent, the Fourth and Four-

rather than make an illegal arrest that would result in suppression of any evidence seized.

teenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Id.,* at 248 (emphasis added).

Not once, but twice, the question the Court today treats as settled was expressly reserved:

"[T]he present case does not require a determination of the proper standard to be applied in assessing the validity of a search authorized solely by an alleged consent that is obtained from a person after he has been placed in custody." *Id.,* at 241 n. 29.

See also *id.,* at 247 n. 36.

I adhere to the views expressed in my dissent in *Schneckloth, id.,* at 277, and therefore believe that the Government must always show that a person who consented to a search did so knowing he had the right to refuse. But even short of this position, there are valid reasons for application of such a rule to consents procured from suspects held in custody. It was, apparently, the force of those reasons that prompted the Court in *Schneckloth* to reserve the question. Most significantly, we have previously accorded constitutional recognition to the distinction between custodial and noncustodial police contacts. *Miranda* v. *Arizona,* 384 U. S., at 477–478. Indeed, *Schneckloth* directly relied on *Miranda*'s articulation of that distinction to reach its conclusion. 412 U. S., at 232. Thus, while custodial interrogation is inherently coercive, and any consent thereby obtained necessarily suspect, *Miranda* (and *Schneckloth*) expressly reject the notion that there is anything inherently coercive about general noncustodial interrogation. 384 U. S., at 477–478; 412 U. S., at 247. For this reason it is entirely appropriate to place a substantially greater burden on the Government

to validate a consent obtained from a suspect following custodial interrogation, however brief. Indeed, it is difficult, if not impossible, to square a contrary conclusion with *Miranda.* A substantially greater burden on the Government means, quite obviously, that the fact of custody is not merely another factor to be considered in the "totality of the circumstances." [23] And, in my view, it means that the Government must show that the suspect knew he was not obligated to consent to the search.

Whether after due consideration the Court would accept this view or not, it is a surrender of our judicial task altogether to ignore the question. And, equally disturbing, it is a distortion of our precedent to pretend that what seemed a difficult and complex problem three years ago is no problem at all today.

I respectfully dissent.

---

[23] Many Courts of Appeals have recognized that a custodial consent is different in kind from one obtained from a person not in custody, and have placed a stiff burden on the Government to validate the consent. *United States* v. *Rothman,* 492 F. 2d 1260, 1265 (CA9 1973); *United States* v. *Nikrasch,* 367 F. 2d 740, 744 (CA7 1966); *Judd* v. *United States,* 89 U. S. App. D. C. 64, 66, 190 F. 2d 649, 651 (1951).